I'm here today. I'm appointed counsel for Mr. Husein Cejvanovic. And the court appreciates your service. Oh, thank you very much. And he had appointed attorney down in the trial court level, so we have appointed attorneys all over. Mr. Cejvanovic was injured in the Iowa prison system, actually quite injured. Somebody maybe took a hammer and broke his hip. He did receive medical treatment, and then after the medical treatment, according to the medical doctors, he needed certain treatment after that, like a cane and some other things, and he experienced pain. And so the district court appointed him an attorney, and we think rightfully so, according to the standards that even you put out as far as when a civil litigant should get appointed counsel. It's non-frivolous. He'll benefit from the counsel, factual complexities, his ability to investigate. And one of the things about Mr. Cejvanovic, he's Bosnian, and his English is very poor. And, in fact, he even writes in Bosnian. So the court appointed Mr. Moriarty to defend this action, and the state of Iowa filed a motion for summary judgment, which wasn't even responded to, strike that. I'll use the term responded to on a merit basis. There's something I didn't understand from the briefs, and I didn't have a chance to study the record. What was the timing? When Mr. Cejvanovic wrote his letter in Bosnian, had discovery closed? I don't know legally if it closed, but here there was no discovery done. Had the summary judgment motion been filed? When he wrote his letter saying he wanted different counsel? Yeah. The motion to say he wanted different was actually the court said it was response to the summary judgment. So after they filed a motion for summary judgment, he filed his letter in Bosnian. Is that the question, Your Honor? Yeah. But summary judgment hadn't been decided? It had not been decided. And, well, we don't know about discovery? Well, we do know. Nothing was really done. I mean, there was no request for productions, no. And in the two cases cited here, the Ray's case and the Taylor case, in both of those cases, it went to trial. But here in this situation, when appointed counsel says, I'm not going to respond to summary judgment based upon a Rule 11. I thought he said, according to opposing counsel, I have no response that would be other than any other response would not be consistent with Rule 11. In other words, I can't satisfy my Rule 11 obligations and make an argument in opposition to summary judgment. That's exactly right, Your Honor. Okay. Now, that's not withdrawing. That's not refusing to cooperate. That's stating a position as an officer of the court. That's correct, Your Honor. Now, what was there in the, if all a district court had was that filing, a letter in Bosnian, counsel's interpretation of the letter, having said I've consulted with an interpreter. I don't know if the interpreter was there. If all a district court can't get from that amount, from that, that there's a request or a demand for new counsel. Your brief just says sort of casually, there were all other kinds of signals that your client wanted a new lawyer. But what were those signals? How would the district court have known that? Well, in that letter, he asked for newly appointed counsel. But she couldn't read it. Well, we got an interpreter and we're appellate counsel. Oh, well, now we have an argument that wasn't made in the brief. The district court breached some duty by not getting independently interpreted. I wouldn't say it was a district court. I would say it was appointed counsel's error. Yes, but counsel had that done and represented to the court, here's my interpretation of the letter. Now, where did the district court commit reversible error? The district court committed reversible error. We'll strike that. Your brief is premised on the district court knew he wanted new counsel and should have appointed. And I'm going back to the premise. On what basis should the district court have known he was asking for new counsel? Well, it was part of the record. It was written in Bosnian. Now, I said, hold on. I said that maybe it was appointed counsel's error. But maybe you're right. It's the trial court's error. It has to be the trial court's error. Okay. If there's no trial court error, we affirm. So we have this letter in Bosnian. The court didn't take any steps to interpret it. In fact, from the record, it appears I don't want to. Well, the court did take a step. The court asked for counsel's, clarified or confirmed that counsel had had it interpreted. Yes. And accepted at face value counsel's interpretation. The interpretation by a lawyer who had said there's no claim here, that there's no defense that would satisfy a lawyer's Rule 11 obligation. So where from that does the district court acquire a duty to interpret this as a request for substitute counsel that invokes the Rays case? Well, I guess you're right to some extent, Your Honor. I mean, the district court took the word of an officer of the court. Right. And that word wasn't really correct. So we really have an issue here that isn't briefed, and I don't know if you'd have any authority. This is not Rays. This is the district court somehow flunked its obligation to look behind the representation of an appointed defense counsel and have a letter in a foreign language interpreted by the court's own interpreter or get the interpreter in and make the interpreter testify. That's your claim, isn't it? Well, Your Honor, in Taylor, the court said that if the court appoints a counsel, it should satisfy itself that the appointed counsel is on the job or is doing its job. So I think perhaps the trial court did have a duty to find out. Well, sure. What is this letter? I thought extensions were granted so that Ms. Moriarty could spend plenty of time to investigate and put together a response to summary judgment. Which he did not. Well, he did. That's alleged. He made a filing at the end of the extended period saying I've done my homework and there's no defense that I could make that would not violate my Rule 11 obligations to the court. But we know that's not. That is not, in my view, unless you've got contrary authority, a breach, a flunking of the court's obligation to do it right. Well, on page 16 of my brief, we mentioned the points that where the medical staff said something and the prison officials said something else, and we went through that list, and in a minimum that probably would have been for appointed counsel enough to say these facts are not uncontroverted. Correct? Well, this sounds now like an ineffective assistance argument. Well, it might be. That's not before us. Counsel, I'd like to turn, if I could, to your argument opposing summary judgment. Do I understand correctly that that's based solely on the refusal of the authorities allowing your client to use a cane? No. There's more to it. The cane is a minor part. It's just another one of the examples where the medical staff at the hospital recommended something, and that didn't get into the prison notes, and therefore it was an uncontroverted fact, or had the underlying counsel done his homework, and actually he only went to the prison officials to find out what the notes were. He didn't do any discovery at the University of Iowa Medical Center to find out what they were saying about the injuries and the post-op care of Mr. Savanovich. Do you agree that on the cane issue in particular, if you don't have this broader claim, that's sort of foreclosed by circuit precedent? We have a 1973 case, Barnes v. Dorsey, that says a prison can say that a cane can be used as a weapon and not give it to them. Yeah, I don't. The cane is not the ruling thing here. I mean, it does kind of make you wonder when they said he needs a cane, and they also took away his walker. I mean, and then as you note, one of our footnotes, you're worried about a cane, but you weren't worried about a hammer that another inmate had that broke my client's hip. So, yes, I understand the cane part, but I think there might be some other things, but that's not the issue. Okay. All right. So the question is, there was something before this court that asked for appointed counsel. The court didn't take any action on it. Mr. Savanovich's claims were never made, unlike Reyes and Taylor. He never got to the trial court. There was no effective material response to motion for summary judgment, and we think by that that this court should vacate this summary judgment, send it back down, appoint new counsel, and have them do a proper investigation and discovery. Mr. Hill? May it please the court again. I represent the Iowa prison officials in this particular case, and I think there's two things that we know about this case, and is one that Mr. Savanovich was not particularly proficient in English. We get that. We understand that. But more importantly, the merits of this case sometimes get lost, is that this was not a particularly complicated case in terms of prison litigation. It's not a failure to protect case. It's the medical treatment case, and the medical treatment in this case was, as a factual matter, provided pretty quickly, promptly, thoroughly. He was injured. He was treated. He was sent to the University of Iowa hospitals and clinics. I think the focus of the court should be on that this was a relatively simple case. There was obviously the language issue that was out there, and the court responded to that by appointing Mr. Moriarty, who used an interpreter to talk with the plaintiff. But kind of at the heart of the whole issue is not whether counsel was great or should have done more, but what was the case about? And the case in this particular, or the fighting issue in this case, was pretty simple. Deliberate indifference on behalf of the prison officials, who promptly shipped him off to the University of Iowa hospitals and clinics. So from that perspective, when the court looks at the standard as to whether or not substitute counsel should have been appointed, it wasn't that complicated a case in terms of, yeah, there was the issue, and I think the court did the right thing by appointing the attorney because of the Bosnian issue, but really if you go down to the facts of what was going on, his complaint wasn't necessarily ignored. It was mainly a fact that he was able to communicate to the court or through the court with the help of appointed counsel. If the claim had any merits, it almost certainly required an expert. Correct. So did the court make any effort to determine whether appointed counsel had looked into whether an expert could help? I don't think the court determined, asked Mr. Moriarty, did you take these steps? I think what we don't know about that is we've either got a delay claim or a wrong treatment claim. Right. And either one of them is going to require a medical expert. Right, and a pretty substantial expert because the treatment was pretty prompt. Plus he didn't sue the treating doctor. And he didn't sue the treating doctor, and thankfully in Iowa we have a great system where we ship them up to very qualified people at UIHC who treat them well. So I think in terms of kind of looking at what Mr. Moriarty did, you know, it's not a strickling case. It's not necessarily a malpractice case. He did what? Well, should the district court have probed a little about what he did to conclude that he couldn't do anything that wouldn't violate Rule 11? I think that's always the issue. Does the court serve as a mediator somewhat between a dissatisfied litigant and their court-appointed counsel to say, did he do this, did he do that? I think at some point the court has to rely upon the representations of attorneys. And I think kind of inherent, if the court had that concern, and I've seen this done in cases where maybe the attorney and the offender don't get along, they'll say, look, we know you want to raise this claim, but this attorney isn't the one for the case. Maybe a new attorney would suit you better. But I don't think the court sensed in this case that that was the issue. I think what the court sensed was that, you know, Mr. Moriarty's statement was that this was a pretty straightforward case. You know, clearly it was a serious medical need, but clearly he was treated pretty promptly, sent up to the University of Iowa hospitals and clinics. Even at the prison he was given x-rays, bed rest, pain medication, and transferred up pretty quickly. And so I think what we have here is not the compelling question is not that, hey, he couldn't speak English. It was at his heart there's not a whole lot of meat to the case. Certainly it's unfortunate that he was injured and that's bad, but that's kind of life in prison. And so we're faced with the Rule 11 response, and so is it a response? Is it a resistance? It doesn't really matter because in the end the question is, does Mr. Shevanovic have a viable claim pursuant to 1983? And we held that, look, he really didn't. He was given treatment. Everything was fine. And so that's really the issue with regards to the claim, not anything with regards to counsel's performance. The best counsel in the world couldn't have made this a viable claim is, I think, essentially what we're saying. So the Iowa prison officials assert in this case that summary judgment was properly granted, and unless there are further questions I would waive all remaining time. Thank you, Judge. I know I'm out of time. Can I take 10 seconds? Sure. You can have a minute. Can we put this in the brief, and I want to be clear about this. Our action isn't about the medical treatment at the time of injury. It's about his treatment for the post-op treatment that he was supposed to get. That doesn't necessarily mean that was medical malpractice. If you operate on your hip, you would think there are certain things you need to do after that operation due to the surgery. It doesn't mean that the doctor erred. It just means that you need to do something, right? If he operates on your foot, a week later he should start walking just because he wants you to take some steps after that. It doesn't mean he did something wrong or just because you have pain in your foot. I understand that. My notes, I got from reading your brief that my notes say that your brief claims that there were many signs of poor attorney-client relations, and I meant to ask you, what was there besides the letter? We produced into evidence a correspondence where the attorney, before he was allowed to withdraw, told the client not to contact him anymore. I think that's, I don't know. That's pretty common. Anything else? Before he withdrew? Before he was allowed to withdraw to tell a client don't contact me? Sure. I've never, somebody goes to the bar and says I paid Chris Sawicki money when Chris Sawicki sent me a letter and said don't ever contact me, and I'm still representing you? Wait a minute. That's a tough one, Your Honor. I don't want to defend that in the bar. Well, you just posed a retained situation. I agree. I see in many, many cases the lawyer says, well, usually when the client is there saying I have to have a new lawyer because the lawyer won't pay attention to me. I agree. Or sufficient attention to me, and the lawyer says, you know, I met with him seven times in three weeks, and he called me 42 more times, and I think we don't have an irreconcilable breakdown in relations. So I think one, that's why, I mean, these things are cumulative, obviously. And, Your Honor, in all fairness to Mr. Moriarty, I've been doing this for 20 years. I've been appointed to trial counsel level for 1983 actions. It's very frustrating. The communication is hard with the client. We call the prison officials, and they treat us like a red-headed stepchild. I know. It's horrible. Horrible is maybe an overstatement. That's why I asked just the extent of it. Thank you. Thank you, counsel. The case has been well briefed and argued, and we'll take it under advisement.